COURT OF APPEALS
DECISION
DATED AND FILED

October 9, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1116**

Cir. Ct. No. 2023TP4

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO L.N.U., A PERSON UNDER THE AGE OF 18:

**A.K.B.,**

  **PETITIONER-RESPONDENT,**

 **V.**

**J.J.G.,**

  **RESPONDENT-APPELLANT.**

APPEAL from orders of the circuit court for Racine County: KRISTIN M. CAFFERTY, Judge. *Affirmed*.

¶1 GROGAN, J.[1] Jay[2] appeals from an order terminating his parental rights and an order denying his postdisposition motion. He argues the circuit court erroneously exercised its discretion when it terminated his parental rights under the voluntary termination statute, WIS. STAT. § 48.41, rather than applying the hearing procedure for involuntary terminations as set forth in WIS. STAT. § 48.422.[3] This court affirms.

## I. BACKGROUND

¶2 Jay and Alice had a nonmarital child, Lisa, together in September 2015. The couple broke up in 2017, and Jay moved from their shared residence after a domestic violence incident that resulted in Jay being arrested and Alice obtaining a four-year restraining order prohibiting Jay from having contact with her. The family court subsequently awarded Alice sole custody of Lisa, allowing Jay secondary placement.[4] Jay never exercised his placement, did not pay any child support, and had no contact with Lisa. Jay ultimately moved from Wisconsin and lived in Oregon at the time of these proceedings. In 2018, Alice met Robert, and she and Lisa moved in with him. Robert and Alice were married in August 2022, and Robert wanted to adopt Lisa.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] For readability, this court uses pseudonyms for multiple individuals (the child, the child's biological/adjudicated parents, and the mother's current husband) instead of initials.

[3] In his postdisposition brief, Jay also raised an ineffective assistance of counsel claim as an alternate ground for relief. Jay abandoned that claim by not raising it on appeal, and this court therefore will not address it further. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491-92, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the trial court, but not raised on appeal, is deemed abandoned.").

[4] The family court proceeding was venued in Milwaukee County.

¶3    In February 2023, Alice filed a Petition seeking to terminate Jay's parental rights to Lisa because he had not had contact with Lisa for approximately six years.  The Petition indicated that Jay "may" consent to termination and listed grounds for termination as abandonment and failure to assume parental responsibility.  *See* WIS. STAT. § 48.415(1), (6).   In addition to the Petition, Alice filed an ex parte motion seeking an injunction asking the circuit court to prohibit Jay from having contact with Lisa during these proceedings.  Alice attached an affidavit stating that Jay:  (1) was the adjudicated father; (2) had not had contact with Lisa since February 2017; (3) had two domestic abuse incidents with Alice; (4) had a drug and alcohol problem; and (5) has outstanding arrest warrants.  The court granted the injunction.

¶4    Jay was served with the Petition and accompanying paperwork in Oregon, where he lived.  In late February 2023, the state public defender's office (SPD) appointed Attorney Natalie Probst to represent Jay.  Approximately one week later, Probst filed a motion to withdraw.  The first hearing on the Petition occurred on March 9, 2023, and Jay appeared by Zoom from Oregon and told the circuit court he wanted to represent himself.  The entire hearing was spent on a self-representation colloquy during which Jay repeatedly testified that he wanted to proceed pro se.  During this testimony, he admitted he was Lisa's father.

¶5    When the circuit court asked Jay if he had read the Petition, he said he had and that he understood Alice's allegation that he had not had any contact with Lisa for "quite some time[.]"  The court then confirmed that Jay understood the burden of proof (clear, satisfactory, and convincing) and that he had the right to counsel and explained that counsel would know more about the law and legal strategies and that representing himself would be more difficult. When asked if he wanted to waive his right to an attorney and instead represent himself, Jay

repeatedly responded "Yes." The court also went through additional questions during the counsel-waiver colloquy, including whether Jay had been pressured or promised anything or influenced by finances in making his request. Jay indicated he had not been and confirmed he was giving up his "right to have an attorney" of his "own freewill." The court pressed further as to why Jay did not want counsel, and he said this was his preference, and it was his "own personal decision."

¶6    After questions from the guardian ad litem (GAL), Jay appeared less sure about self-representation. However, when the circuit court asked if he understood that he would need to come to Racine, Wisconsin for an "in-person trial" if he chose to contest the Petition, he confirmed that he did and that he did not want more time to consider his decision. Attorney Probst thereafter asked the court to adjourn the hearing so she could further discuss Jay's self-representation request with him. Because Jay was willing to engage in further discussion with Probst, the court adjourned the hearing to April 26, 2023.

¶7    At the April 2023 hearing, Jay again appeared by Zoom from Oregon. He informed the circuit court that he had changed his mind about representing himself and explained that while he wanted to be represented by counsel, he did not want to be represented by Attorney Probst. Probst advised that the SPD would appoint successor counsel and continued to represent Jay through the remainder of the hearing for the purpose of proceeding with Jay's initial appearance. Jay admitted he had received and reviewed the Petition, and Probst entered "denials, preserving [Jay's] right to trial." Probst also confirmed that Jay was requesting a jury trial for the factfinding hearing (grounds phase), and the court thereafter advised Jay he would need to appear in person for the jury trial.

¶8      The next hearing occurred on June 2, 2023, with Jay again appearing from Oregon via Zoom.  Jay's new counsel informed the circuit court that the matter would "most likely [be] set for trial" and that she would like the court to schedule an additional status conference to afford counsel an opportunity to engage in discovery.  The court obliged, setting an additional status/pretrial hearing and also scheduling the factfinding jury trial for October 10-12, 2023.  The court informed Jay he could appear by Zoom for the status/pretrial hearing but that it expected him to appear in person at the jury trial.

¶9      At the August 28, 2023 status/pretrial hearing, the GAL sought an order requiring Jay to submit to hair and follicle drug testing prior to the jury trial.  The circuit court noted that Alice had alleged Jay had a "severe drug and alcohol problem" and that Jay had admitted to the GAL that he had "been to rehab for drug problems."  The GAL had previously asked Jay to submit to drug testing in February, and he submitted a urinalysis that showed only marijuana in his system.  After discussing costs and whether there was a facility in Oregon where Jay could obtain a hair and follicle drug test, the court ordered Jay to submit to the drug test "within the next seven days."[5]  The court told Jay that if he encountered any problems or difficulties in doing so, it wanted to know because it did not "want to

---

[5] Before the hearing concluded, the GAL notified the circuit court that a quick internet search indicated that the closest drug testing facility to where Jay lived was five hours away.  The court indicated that the process needed "to be a reasonable process for" Jay and that because Jay "has apparently admitted this is a problem for him in the past … [he] needs to show a reasonable effort to demonstrate his claims of sobriety as well."

Jay filed a petition with this court seeking an interlocutory appeal challenging the circuit court's drug testing order.  He also filed a motion in the circuit court to stay the trial until the appeal was resolved.  This court denied Jay's petition on the drug order, and the circuit court denied his stay request.  Four days before the trial was scheduled to begin, Jay filed a motion asking the circuit court to reconsider its drug testing order, indicating that he had attempted to find a testing facility but the closest one was five hours away.

put the trial off because the court has reserved the time for this jury trial." It was also requested that Alice provide documentation to support the averment in her affidavit that there were outstanding warrants for Jay's arrest.[6] Before concluding the hearing, the court again emphasized that Jay needed to "be here in person for the jury trial."

¶10 The next court hearing occurred on October 10, 2023—the first day of the scheduled jury trial. Jay, however, had not travelled to Wisconsin and instead appeared by Zoom from Oregon. Having previously informed Jay that he was to appear in person for the jury trial, the circuit court asked him why he had not complied with that directive. Jay's counsel did not answer the question directly, instead informing the court Jay was "willing to *stipulate to the grounds phase* and waive jury trial" and asked the court to conduct a colloquy with Jay as to grounds. (Emphasis added.)

¶11 Given Jay's request and that he was appearing remotely via Zoom, the circuit court referenced WIS. STAT. § 48.41, which addresses consent to a *voluntary* termination of parental rights (TPR) and explicitly permits a party to consent to a *voluntary* TPR via Zoom. The court then contrasted the process for an involuntary TPR, noting that it did not "see any [statutory] reference to" allowing a party to appear remotely when proceeding with an involuntary TPR. After explaining this to the parties, the court asked Jay if he was stipulating that grounds existed for termination and whether he was asking the court to "proceed today[.]" Jay answered affirmatively, and the court placed Jay under oath.

---

[6] The Record reflects that Alice filed her answers to Jay's discovery requests after the pretrial hearing and that in doing so, she attached documentation from the domestic abuse cases that showed Jay was in absconder status and that also reflected that Jay had outstanding warrants.

¶12    During his sworn testimony, Jay again admitted he was Lisa's father, and the court proceeded to ask the necessary questions that ensured it that Jay was knowingly, voluntarily, and intelligently admitting that grounds existed to terminate his parental rights.  Specifically, the court went over both the abandonment ground and the failure to assume parental responsibility ground alleged in the Petition with Jay.[7]  Jay told the court he understood both grounds and confirmed that he understood he had the right to a trial on grounds.  When the court inquired as to why he was not in the courtroom, Jay testified he did not have sufficient funds to travel to Wisconsin.  When the court asked if the lack of funds was the "only reason" he decided not to move forward with the jury trial, Jay answered "[a]t the time being, yes[,]" and told the court that if he had the money, he would have come to Wisconsin and proceeded with the jury trial.

¶13    The circuit court again indicated it would "accept a *voluntary* consent via zoom or via phone" but that it had concerns about using those options for an involuntary TPR trial.  (Emphasis added.)  After Jay told the court that his request to proceed by stipulating to grounds was based solely on finances, the court allowed Jay and his counsel an additional opportunity to discuss his decision and said it would consider another adjournment if that would allow Jay to gather sufficient funds to appear in person.  After Jay and his counsel conferred privately, counsel asked the court for an adjournment.  Alice's counsel objected, stating that Alice wished "to go forward today" and argued that Jay had known about the trial date for a long time and had a significant period of time to save money to travel to

---

[7] There was initially some confusion as to whether the Petition alleged both abandonment under WIS. STAT. § 48.415(1) and failure to assume parental responsibility under § 48.415(6).  All parties ultimately agreed it alleged both grounds.

Wisconsin. Alice's counsel also pointed out that they had a jury ready to go and that there was no guarantee Jay would appear in person even if they rescheduled the jury trial. The GAL agreed with Alice's counsel and likewise did not object to proceeding with the jury trial as planned even if Jay appeared by Zoom.

¶14 Jay's counsel, however, continued to push for an adjournment, arguing that Jay appearing via Zoom to the jury would be prejudicial and that "poverty alone" should not force Jay to forego an in-person jury trial. Jay's counsel told the circuit court that Jay had told her that he would work diligently to save the money and would come to Wisconsin for a rescheduled jury trial if the court granted the adjournment. When questioned as to how an adjournment would change his finances, Jay told the court he makes all his money for the year from June to October and that he had used that money to travel back and forth to welding school. He indicated, however, that he planned to apply for unemployment and that he would then have weekly income from which he would be able to save enough to travel.

¶15 The circuit court reluctantly adjourned the trial so that Jay could appear in person and sternly warned him that it would not accept any additional excuses and that it would not grant any more adjournments related to Jay's financial situation. The court then addressed the pending motions in limine, one of which was a request that Jay be allowed to appear in street clothes for the trial if he was arrested and incarcerated upon returning to Wisconsin due to an open warrant and being in "absconder status." The court was frustrated that this information had not been made more clear before it decided to adjourn the trial because these facts suggested Jay's reason for not appearing in person for the scheduled jury trial that day was not, as it turned out, solely due to finances.

8

However, the court stood by its decision to adjourn because it had already released the jury.

¶16    The circuit court thereafter set a new pretrial date for December 1, 2023, and the new trial date for December 19, 2023.  The court again warned Jay that it expected him to appear in person, stating:  "I'm giving you the benefit of the doubt that I will reserve additional dates but I want you to understand I have given you your opportunity.  I will not give you another opportunity to present yourself here."  The court went on to inform Jay he was to have his travel plans in place by the pretrial date and that he should be prepared to inform the court of his travels plans so "that we can ideally make arrangements to deal with whatever warrant status exists and processing and things like that so we do not have undue delays, understood?"  Jay said he understood.

¶17    Following the October hearing, the parties filed various documents and motions leading up to the trial date.  On November 9, 2023, Alice filed certified judgments of conviction as to Jay's domestic violence convictions.  She also filed an order from the family court case indicating Jay had absconded from the state and that the family court had set specific conditions for Jay before he could have any contact with Lisa—specifically, that Jay undergo a batterer's intervention program, attend parenting classes, and complete a mental health evaluation.

¶18    On November 27, 2023, Jay filed a motion asking the circuit court to order genetic testing pursuant to WIS. STAT. §§ 48.423(1) and 48.299(6).[8]  He

---

[8] WISCONSIN STAT. § 48.423(1) provides:

(continued)

argued that although he had been adjudicated Lisa's father in August 2017, there had been no DNA test. The GAL filed a responsive motion seeking to dismiss Jay's motion on the basis that there was a paternity action in Milwaukee County in May 2017 during which Jay had signed "a voluntary paternity acknowledgment (VPA)[.]" The GAL also pointed out that in January 2023, Jay filed a motion in the family law case seeking to modify the underlying placement order to Lisa—thus recently acknowledging he was the father. And, finally, the GAL argued in his motion that § 48.423(1), the statute Jay was relying on, was inapplicable because it applies when a person who has not yet been adjudicated as the father comes forward claiming to be the father. Here, by contrast, Jay had been adjudicated the father six years earlier and had repeatedly testified under oath that he was Lisa's father.

¶19    The circuit court began the December 1st pretrial conference by addressing Jay's genetic testing motion. In regard to Jay's motion, the GAL asserted his belief that Jay was simply seeking to delay the jury trial on grounds yet again and wanted to make it clear for the Record that Jay "still has an

---

> If a person appears at the hearing and claims that he is the father of the child, the court shall set a date for a hearing on the issue of paternity or, if all parties agree, the court may immediately commence hearing testimony concerning the issue of paternity. The court shall inform the person claiming to be the father of the child of any right to counsel under s. 48.23. The person claiming to be the father of the child must prove paternity by clear and convincing evidence. A person who establishes his paternity of the child under this section may further participate in the termination of parental rights proceeding only if the person meets the conditions specified in sub. (2) or meets a condition specified in s. 48.42(2)(b) or (bm).

WISCONSIN STAT. § 48.299(6) addresses various hearing procedures and required actions that are unnecessary to address further.

10

outstanding warrant in the state of Wisconsin and" that he believed the outstanding warrant was "part of the reason, aside from the financials, part of the reason he is not returning to Wisconsin[.]" Alice's counsel also noted "that the whole purpose of the adjournment" at the time of the October trial was to allow Jay an opportunity to appear in person.

¶20 After hearing from the parties, the circuit court held that the statutes Jay relied on in his motion did not apply to his circumstances. It ruled, however, that WIS. STAT. § 767.805(5)[9] allows a father to rescind a VPA at any time *if* he proves there was fraud, duress, or a mistake of fact when he signed the VPA. Accordingly, the court stated it would allow Jay to attempt to make that showing on the first day of trial and that if he did, it would allow genetic testing. Shortly thereafter, however, Jay's counsel disclosed that Jay "does not have travel arrangements to come to [the December] trial" and that it was their "intention today … to set this for a *voluntary* on the grounds and ask for a hearing on the dispositional phase."[10] (Emphasis added.) The court asked counsel to clarify Jay's intentions, stating: "You're telling me that your client wishes to forego a jury trial and enter into a *voluntary termination of parental rights* but requests to have a paternity test before going through with that?" (Emphasis added.) Counsel responded that Jay needed to know whether he is the father before making a decision.

---

[9] WISCONSIN STAT. § 767.805(5)(a) provides: "A determination of paternity that arises under this section may be voided at any time upon a motion or petition stating facts that show fraud, duress or a mistake of fact."

[10] The term *voluntary* in the context of a TPR proceeding typically refers to a parent's agreement to voluntarily consent to the termination of his or her parental rights.

¶21    The circuit court informed Jay and his counsel they had taken "two different positions" during the hearing—that Jay "want[ed] to fight for his rights" and "that he want[ed] to enter into a *voluntary*" termination of his rights—but that he could not "do both[.]"  (Emphasis added).  The court also observed that requesting this testing at the last minute gave it "concern about [Jay's] intentions here in prolonging this matter in the event that he intends to challenge" the Petition.  The court was understandably frustrated given the prolonged history of this case.  It said:

> I want to protect his rights.  I have afforded him an opportunity to have a jury trial.  I adjourned it once already. I'm not inclined to adjourn it again.  If he has not made arrangements to come to the jury trial, that is on him.  I made it very clear what I expect of him.  I have repeatedly indicated that he needs to be prepared to be in Wisconsin to have this jury trial.  I have reserved the time on the court's calendar which I will tell you is very clogged and I have reserved that right now twice.

The court also noted its disappointment that Jay had not yet made travel arrangements to attend the jury trial but acknowledged that it was "not too late" for him to do so.

¶22    After the circuit court reiterated its intent to allow Jay to prove his WIS. STAT. § 767.805(5)(a) claim on the first day of trial, Jay's counsel represented that Jay was asking the court to set "this over for a *voluntary* and a best interest phase" because "as of right now, he is not going to be able to make it to Wisconsin."  (Emphasis added.)  The court declined to remove the trial date from its calendar, which it explained left Jay with three choices—show up for the jury trial and contest grounds, be defaulted on grounds for not appearing, or enter a "voluntary" termination of his parental rights.  The court explained that Jay knew "what has been expected" and that he "had plenty of opportunity to return to

12

the state for a trial if that is how he wishes to proceed." It then advised that if Jay wanted to have a "best interest trial" to the court "instead of [a] TPR trial" to a jury, he could "present whatever evidence" he wanted at that time.

¶23 The circuit court thereafter ruled that Jay would need to personally appear for the genetic testing motion and trial in December, and after it did so, Jay's counsel inquired as to whether "there would be an opportunity to do a *voluntary* on one of" the trial days if Jay could not be physically present. (Emphasis added.) As it had done at an earlier hearing, the court confirmed that the TPR statutes allow for "a *voluntary termination* of parental rights" to "take place with an appearance electronically" and asked the GAL and Alice's attorney whether they would object to Jay's appearance by Zoom if he decided "to have a *voluntary*[.]" (Emphases added.) Both attorneys confirmed they would not object.

¶24 Jay's counsel next sought clarification as to whether there would be an additional pretrial before the December trial, and the circuit court said that it would do so "[i]f the parties fe[lt] that it would be helpful to" do so. It went on to say:

> In the event there is a stipulation on *the voluntary, if he entered into a voluntary TPR*, there still needs to be [a] dispositional hearing so that will still take place, just not in front of a jury. I would expect we have the dispositional hearing immediately following the voluntary. There's a lot that needs to be decided. If you feel that it would be helpful to have a hearing before the trial, I would accommodate that request.

(Emphasis added.) After some discussion—which included multiple references to proceeding with a "*voluntary*"—the court scheduled an additional pretrial hearing for December 14, 2023. (Emphasis added.)

13

¶25     At the December 14th final pretrial hearing, Jay again appeared by Zoom from Oregon.  The circuit court began the hearing by asking Jay what his "position" was "moving forward," and Jay's counsel responded that "travel arrangements have not been made" and that Jay was "prepared to proceed with a *voluntary* on the grounds today."  (Emphasis added.)  The court then asked Jay if he was able to testify, and he responded affirmatively.  When asked directly and specifically whether he was "willing to move forward with a *voluntary termination of parental rights*" that day, Jay answered, "Yes."  (Emphasis added.)  The court placed Jay under oath and confirmed there were no objections from any of the attorneys as to "proceeding right now with a voluntary[.]"  The court then proceeded through the voluntary termination of parental rights colloquy with Jay.

¶26     As relevant, the circuit court asked Jay the following questions, which he answered affirmatively:

- "Do you understand that if I grant *your request for a voluntary termination of parental rights*, that once it's granted, it will end all legal relationship between you and the child?"

- "And you also understand that if I grant *your request to do a voluntary termination of parental rights*, it will end all legal relationships between your relatives and child?"

- "Do you understand that *your decision to terminate your parental right* is a final decision and it cannot be changed once it has been approved by the court and the court order is signed and filed?"

(Emphases added.)  The court also asked Jay to explain "in [his] own words why [he was] making the decision to go forward with a *voluntary termination of parental right*[.]"  (Emphasis added.)  Jay responded:  "I understand they definitely have grounds to find me guilty, that's why *I'm asking for voluntary*."  (Emphasis added.)  Jay also confirmed he understood "it would be very difficult

and unusual for [an appellate] court to overturn a *voluntary termination of parental right* and" that it was "very unlikely that an appeal would be successful in overturning *this voluntary termination of parental rights*[.]"  (Emphases added.)

¶27    In addition, the circuit court asked Jay if he had discussed his rights and decision with his counsel, if he had enough time to consider the decision, if he had any questions, and if he was comfortable and confident with this permanent decision.  Jay answered affirmatively.  After confirming Jay understood his rights, the court asked Jay if he "still wish[ed] to enter into a voluntary termination of parental rights for [Lisa,]" and Jay responded "Yes."

¶28    Next, the circuit court asked a series of questions to Jay's counsel, including whether counsel had:  (1) explained to Jay "the *voluntary termination* of the fact-finding phase"; (2) "gone over the consequences of a *voluntary termination*" with Jay; (3) discussed with Jay "mitigating circumstances and defenses"; and (4) gone "over all the rights that [Jay] has and is giving up *by this voluntary termination*[.]"    (Emphases added.)    Jay's counsel responded affirmatively.  Counsel also confirmed that she believed Jay's decision "to enter into a voluntary termination as opposed to contesting the allegations in the petition and having a jury trial [was] in [Jay's] best interests[.]"

¶29    After very thorough and complete colloquies with both Jay and his counsel, the circuit court noted it was not necessary to obtain the GAL's input on

"a *voluntary termination*[.]"[11]   The GAL agreed.   The court then announced its ruling:

> [B]ased on [Jay's] testimony and the information I've received from his counsel, [the court] approve[s] the *voluntary termination of parental right* made by [Jay] and the waiver of his right to contest the petition to terminate the parental right.  I will find that his *voluntary termination* is being made knowingly, voluntarily and intelligently, with a full understanding of the proceeding, the potential consequences of the decision, the rights that are being given up. *I will accept his voluntary termination.*  We will postpone the dispositional phase until December 19th at 9:00 a.m. at which time I expect we'll receive some additional testimony on the dispositional phase.

(Emphases added.)  Before adjourning, the court asked all counsel if anything else needed to be addressed.  Jay's counsel informed the court Jay was withdrawing his motion for genetic testing, and the GAL withdrew his motion to add a third ground for termination to the Petition.[12]

¶30     The dispositional hearing occurred as planned on December 19th. Jay testified by Zoom from Oregon, and Alice and her husband testified in person. Alice testified that she thought termination was in Lisa's best interests because Jay had not had contact with Lisa over the past six years, that Jay was a stranger to Lisa at that point, and that Lisa, who was eight years old at the time, considered

---

[11] The circuit court asked additional questions that are not set forth as excerpts in this opinion as this court recounts only those parts of the colloquies pertinent to the issue raised on appeal.

[12] The circuit court also addressed an inappropriate correspondence the GAL had received from Jay that had prompted the GAL to request that any further contact from Jay with the GAL go through Jay's counsel.  Specifically, Jay had texted the GAL a message that said, "I just want to personally tell you fuck you[,]" accused the GAL of not having given him a fair shake, and suggested that Alice and Robert had bribed the GAL.  The court indicated that "in light of [Jay's] *voluntary* termination of parental rights today, [it would] disregard the nature of [Jay's] messages and chalk them up to an emotional response."  (Emphasis added.)

Alice's husband, Robert, to be her father. Robert testified that Lisa is like a daughter to him and he wanted to adopt her. He also indicated that he believed that termination was in Lisa's best interests because "[r]ight now she has every stability, everything that a kid would need in her life" and that disrupting that stability would have a negative impact on her.

¶31 Jay testified that the day Lisa was born was the "[h]appiest day of [his] life[,]" that he left Wisconsin because he "was addicted to heroin and cocaine" and had gone to a thirty-day outpatient program, and that he is now clean and sober. He also confirmed he left Wisconsin while he was on probation and that he has an outstanding warrant. Jay conceded that Lisa is happy and has a consistent routine and good life and that while he did not want to disrupt that, he wanted to be a part of it.

¶32 The GAL advised the circuit court that Lisa wished to have Robert adopt her and that she had told the GAL that Robert was her father.

¶33 In its oral decision, the circuit court first emphasized that there had been a "*voluntary termination of parental rights*" during the grounds phase. (Emphasis added.) Next, the court noted that the current hearing was focused on the dispositional phase only, and it therefore needed to address the statutory factors set forth in WIS. STAT. § 48.426. In addressing those factors, the court found "there is a very high likelihood of adoption if the Court grants the termination of parental rights." It further found Robert's testimony "very compelling" in regard to the "very significant and father like relationship" he had developed with Lisa. The court also considered Lisa's age, noting that she was two years old when Jay left Wisconsin and that it was "unlikely" she had any memory of him. It also found that Lisa was healthy and doing well in school.

¶34 In addressing whether Lisa had a substantial relationship with Jay and the effect of severing their relationship, the circuit court acknowledged that severing any parental relationship would cause "some harm." However, it found "the harm that [Lisa] will incur in severing her [relationship with her] biological [father] will be substantially outweighed by the relationship that she has formed with [Robert] and will continue to have with [Robert's] family." On that factor, the court continued:

> it is significantly better for her at this phase of her life to have the daily contact with a person that she trusts and who presides as her father on a day to day bas[i]s than it would be for her to have occasional contact with a father who lives in [Oregon] far, far away. He has not regularly or consistently had contact with her over the last six years.… [Jay] did not present testimony that despite knowing about the birth of [Lisa] that his family had made any attempts to sustain important familial relationship during his period of crisis and during his period of time where he was undergoing treatment for his addiction issues. So there is no evidence in the record there is any familial relationship between anyone in [Jay's] family and this child.

(Formatting altered.)[13]

¶35 Based on the foregoing, the circuit court found that there was "no substantial relationship between" Lisa and Jay "at this time." It also noted Lisa's wishes—with the caveat that she was eight years old and that her wishes could change—and noted that if Lisa's wishes do change, she may reach out to Jay once she is eighteen years old. The court also addressed Lisa's character and conduct and found that she is stable, happy, and has a good relationship with Robert and

---

[13] Jay interrupted while the circuit court was talking, and when the court asked Jay to let it finish, Jay responded: "You are taking from me. I want to say whatever the fuck I want." The court warned Jay that it would mute him if he continued "to disrupt [the] proceedings[.]"

that she wanted Robert to adopt her. Additionally, the court acknowledged that Jay's lack of contact with Lisa over the previous six years had been due at least in part to Jay's focus on overcoming his addictions. It explained, however, that even when seeking to overcome an addiction, a parent can still communicate with a child via letters or other family members even when physical contact may not be an available option. Jay, it noted, did not do so.[14]

¶36　The final factor the circuit court considered was whether Lisa would "enter into a more stable permanent family relationship" if it terminated Jay's parental rights, and it found that she would. In reaching this conclusion, the court commented that Robert had taken on "the obligation of being a father figure to" Lisa for many years and that this demonstrated Robert's "character and what a wonderful father he will be to [Lisa] as part of an adoption process in the future."

¶37　Accordingly, the circuit court held that "it has definitely been proven it is in this child's best interests to sever the relationship with her biological father." Following the hearing, the court entered an order terminating Jay's parental rights.[15]

---

[14] During these comments, Jay again interrupted, causing the circuit court to mute him, but he "hung up" and left the hearing. The court noted that after Jay left the hearing, he never rejoined the Zoom session.

The GAL advised the court, however, that Jay had just messaged him saying "he will be seeing me" and that the GAL wanted "to put that on the record today in case anything were to occur." Jay's counsel immediately responded that Jay's message was "not a real threat of any sort" and that he was just upset and "charged with emotion." This court notes that even when "charged with emotion[,]" making threatening statements and swearing at the circuit court is unacceptable and inappropriate conduct.

[15] Because the grounds phase proceeded as a "voluntary" termination of Jay's parental rights, the circuit court issued the TPR order used for voluntary TPR proceedings.

¶38   In July 2024, Jay filed a postdisposition motion seeking to vacate the TPR order on the basis that the circuit court did not conduct a proper colloquy during the grounds phase. Specifically, Jay argued he did not agree to consent to a *voluntary* termination of his parental rights on December 14th but rather that he had agreed to stipulate that grounds existed to find him unfit and that he wanted to continue his contested posture at the dispositional hearing. The court held a hearing on the motion and noted the following. First, it noted that Jay had appeared by Zoom on December 14, 2023, at what was supposed to be the final pretrial for a December 19th in-person contested jury trial on grounds and that instead of providing the court with his travel plans as it had previously directed him to do, Jay informed the court he would not be coming and wanted to do a "voluntary." Next, the court noted that it had proceeded with the voluntary TPR and that it allowed Jay to present evidence at the dispositional phase and to argue that terminating his parental rights was not in Lisa's best interests.

¶39   The circuit court also recounted that it had discussed its belief that Jay was proceeding with a voluntary TPR under WIS. STAT. § 48.41, not WIS. STAT. § 48.422, with the attorneys and that there had been no objections to the court proceeding under § 48.41. The court explained that it had not taken a plea because the procedure for a voluntary TPR does not so require. It further explained that parents sometimes choose to consent to a *voluntary* TPR because unlike in an involuntary TPR proceeding, the court is not required to make a finding that a parent is unfit, which is advantageous because once a parent is found unfit, it may affect parental rights to future children.

¶40   Jay's appellate counsel conceded that if the December 14th hearing was governed under WIS. STAT. § 48.41, the circuit court followed the proper procedure. Counsel argued, however, that Jay did not intend to consent to a

20

voluntary termination of his parental rights because he wanted to contest the Petition at disposition. The court denied Jay's motion, and Jay appeals.

## II. DISCUSSION

¶41 The Wisconsin Statutes provide for both the voluntary and involuntary termination of parental rights. *See* WIS. STAT. §§ 48.41 and 48.415. The issue in this case is whether the circuit court erroneously exercised its discretion when it terminated Jay's parental rights by following the procedures set forth in § 48.41, which governs the procedures for a voluntary TPR, rather than those set forth in WIS. STAT. § 48.422, which governs the procedure for an involuntary TPR. This court will not set aside the circuit court's factual findings unless they are clearly erroneous, and this court affirms a circuit court's decision if it considered the pertinent facts, applied the correct law, and demonstrated a rational process in making its decision. *See **Gerald O. v. Cindy R.**,* 203 Wis. 2d 148, 152-53, 551 N.W.2d 855 (Ct. App. 1996).

¶42 Jay asserts on appeal that the circuit court erred by following the procedures for a voluntary TPR as set forth in WIS. STAT. § 48.41 rather than those set forth in WIS. STAT. § 48.422 in regard to an involuntary TPR because he says it was clear that he intended to oppose disposition and thus remained in an involuntary TPR posture. In other words, Jay says that because he intended to oppose the termination of his parental rights at disposition, he did not agree to proceed under the voluntary TPR statute. A thorough review of the Record belies Jay's argument.

¶43 At the outset, this court notes that Jay undoubtedly began these proceedings in a contested or involuntary TPR posture. However, as is evident from the numerous transcript excerpts from various hearings set forth above, that

21

posture clearly evolved over the course of these proceedings. Specifically, the evolution of Jay's intentions can be clearly seen in his repeated failure to travel to Wisconsin for the scheduled jury trial on grounds despite the circuit court having warned him on multiple occasions—spanning multiple hearings over many months—that he was required to be physically present for the jury trial and that remaining in the involuntary posture would ultimately require his physical presence. After these repeated reminders and admonitions, which included the circuit court informing Jay at the December 1st hearing that he had three choices—appear in person on December 14th for the jury trial, be defaulted if he failed to appear, or appear by Zoom and agree to enter a voluntary termination of his parental rights—Jay ultimately informed the circuit court at the December 14th hearing that he wished to proceed with a "voluntary." Notably, Jay, as he had done throughout the pendency of this matter, appeared via Zoom for the December 14th hearing at which he informed the circuit court of his decision to proceed with the "voluntary."

¶44 Importantly, by the time Jay informed the circuit court that he wished to proceed with a "voluntary," the circuit court had repeatedly referenced WIS. STAT. § 48.41, the voluntary TPR statute, due to Jay's repeated appearances via Zoom, and it had likewise repeatedly explained that it could accept a *voluntary* consent to terminate his rights via Zoom, but Jay would need to be in person to proceed with an involuntary TPR.[16] The Record demonstrates that no party—

---

[16] This court is aware of one precedential case where a parent appeared by "webcam" for an involuntary grounds trial. *See Waukesha Cnty. DHHS v. Teodoro E.*, 2008 WI App 16, ¶9, 307 Wis. 2d 372, 745 N.W.2d 701. However, that case is distinguishable in that the parties in that case used webcams because the father had been deported and it was impossible for him to return to the United States for the grounds trial. *Id.*, ¶¶5, 16.

including Jay—ever objected to the circuit court's references to the voluntary termination of parental rights and § 48.41. And, when the circuit court proceeded with the voluntary termination under § 48.41, Jay repeatedly confirmed that that was what he wanted to do, and his counsel never objected or otherwise sought to clarify with the court that Jay actually wished to remain in an involuntary TPR posture.

¶45 That Jay was aware of the distinction between proceeding with a voluntary TPR and stipulating to grounds under the involuntary TPR procedure is further evident given that his counsel, at the October 10th hearing, initially informed the court that Jay was "willing to *stipulate* to the grounds phase[.]" (Emphasis added.) However, at subsequent hearings, Jay's counsel, like the circuit court, instead repeatedly used the word "voluntary," thus demonstrating an understanding that Jay's posture had evolved. In light of the repeated use of the word "voluntary" in reference to the termination of Jay's parental rights, Jay's postdisposition claim that he was *not* proceeding with a voluntary termination of his parental rights despite having informed the circuit court that he wished to proceed with a *voluntary* and then testifying that he consented to a "*voluntary termination of parental rights*" is disingenuous.[17] (Emphasis added.) This court therefore concludes that the circuit court did not err in proceeding with a voluntary termination of Jay's parental rights.

_____

[17] Equally disingenuous is Jay's assertion that "he would not have entered the 'voluntary' if he fully understood what it meant" given that he also acknowledges that "[i]t was clear that [he] was interested in admitting to grounds for TPR" and then "contesting at disposition that" termination his parental rights was not in Lisa's "best interest." The latter procedure would have accomplished functionally the same result, except that Jay would have a permanent finding on the Record that he is an unfit parent.

¶46     Jay's appellate counsel conceded during the postdisposition hearing that the circuit court followed the correct procedure as set forth in WIS. STAT. § 48.41 if Jay truly had agreed to voluntarily consent to the termination of his parental rights. Despite this concession, this court has nevertheless reviewed the circuit court's actions and concludes that it did not err.

¶47     Where a parent elects to *voluntarily* consent to the termination of parental rights, WIS. STAT. § 48.41(2)(a) directs that the circuit court "may accept the [voluntary] consent only after the judge has explained the effect of termination of parental rights and has questioned the parent, or has permitted an attorney who represents any of the parties to question the parent, and is satisfied that the consent is informed and voluntary." In *T.M.F. v. Children's Service Society of Wisconsin*, 112 Wis. 2d 180, 196-97, 332 N.W.2d 293 (1983), our supreme court identified the basic information a circuit court must ascertain in determining whether the parent's consent to termination of parental rights is informed and voluntary:

> 1. [T]he extent of the parent's education and the parent's level of general comprehension;
>
> 2. [T]he parent's understanding of the nature of the proceedings and the consequences of termination, including the finality of the parent's decision and the circuit court's order;
>
> 3. [T]he parent's understanding of the role of the guardian ad litem (if the parent is a minor) and the parent's understanding of the right to retain counsel at the parent's expense;
>
> 4. [T]he extent and nature of the parent's communication with the guardian ad litem, the social worker, or any other advisor;
>
> 5. [W]hether any promises or threats have been made to the parent in connection with the termination of parental rights;

> 6. [W]hether the parent is aware of the significant alternatives to termination and what those are.

*Id.* Having reviewed the Record, it is clear that the circuit court complied with these requirements.

¶48 "Once a trial court is satisfied that the consent is voluntary," it proceeds to the dispositional hearing to determine whether termination of the parent's parental rights is in the child's best interests. *A.B. v. P.B.*, 151 Wis. 2d 312, 319, 444 N.W.2d 415 (Ct. App. 1989). The dispositional phase occurs regardless of whether the parent consents to a voluntary TPR or contests an involuntary TPR. *See* WIS. STAT. § 48.41(1) (after a parent voluntarily consents to the termination of parental rights, "the judge may proceed immediately to a disposition of the matter after considering the standard and factors specified in s. 48.426"); WIS. STAT. § 48.424(4) (where "grounds for the termination of parental rights are found by the court or jury, the court shall find the parent unfit[,]" and the dispositional hearing shall follow thereafter). At the disposition hearing in this matter, the circuit court thoroughly addressed the required statutory factors and determined it was in Lisa's best interests to terminate Jay's parental rights. Having reviewed the Record, this court concludes that the circuit court's decision was not an erroneous exercise of discretion.

¶49 Even if this court could ignore the repeated transcript references that plainly show that Jay was proceeding with a *voluntary* termination of his rights, there is no merit to Jay's argument asking for reversal because it is clear that he was not prejudiced. As our supreme court has held, if a parent is not prejudiced by error in the proceedings in the circuit court, he is not entitled to a do-over. *See Steven V. v. Kelley H.*, 2003 WI App 110, ¶¶24-25, 263 Wis. 2d 241, 663 N.W.2d 817, *aff'd on other grounds*, 2004 WI 47, 271 Wis. 2d 1, 678 N.W.2d 856

(recognizing two supreme court cases that have used a harmless error analysis in TPR proceedings).

¶50 Here, there is no reasonable likelihood that reversing the orders in this case and remanding for an involuntary, contested TPR would result in a different outcome. It was undisputed that Jay abandoned Lisa as that term is defined in the statute, and there is simply no likelihood of success at the grounds phase as he has already testified under oath that grounds existed to terminate his parental rights. And, the circuit court's findings at the dispositional phase would not change even if this court reversed and remanded—Lisa would still not have a substantial relationship with Jay, she would still not have any memory of him, she would still see Robert as her father, and it would still be in her best interests to terminate so she could be adopted and remain in a stable, safe, and permanent, happy home.

¶51 Jay claims he did not want to voluntarily terminate his parental rights but rather wanted to stipulate that grounds existed but still argue against termination at the dispositional phase. Jay suggests that a parent who consents to a voluntary termination of parental rights pursuant to WIS. STAT. § 48.41 is not entitled to oppose termination at disposition. Assuming without deciding that that is typically the case,[18] the circuit court here nevertheless chose to allow him to participate at the disposition hearing even though the Record shows that he voluntarily terminated his parental rights. In essence, Jay received exactly what he wanted—an opportunity to try to convince the court that it was in Lisa's best

---

[18] While some voluntary TPR proceedings both begin and end as voluntary proceedings, others, such as the TPR here, begin in an involuntary posture but ultimately conclude as a voluntary TPR.

26

interests to not terminate his parental rights. Jay not only participated at the dispositional hearing by testifying and cross-examining witnesses but also argued that it was not in Lisa's best interests to terminate his parental rights. To wit, in Jay's closing argument, Jay's counsel argued that Alice had "suspiciously" filed the Petition seeking to terminate his rights "less than a month" after he had "filed for placement and custody" in the family law matter and that it "is not in the best interests of [Lisa] to terminate [Jay's] parental rights." Based on all of the facts and circumstances in this case, even if any error occurred, it was harmless.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.