In re the Termination of Parental Rights
to Adrianna A. E., a Person Under the Age of 18:

Waukesha County Department of
Health & Human Services, Petitioner-Respondent,

v.

Teodoro E., Respondent-Appellant.
[Case No. 2007AP2283.]

In re the Termination of Parental Rights to
Antonio M. E., a Person Under the Age of 18:

Waukesha County Department of Health & Human
Services, Petitioner-Respondent,

v.

Teodoro E., Respondent-Appellant.
[Case No. 2007AP2284.]

Court of Appeals

*Nos. 2007AP2283, 2007AP2284.*
*Submitted on briefs December 4, 2007.*
*—Decided December 19, 2007.*

2008 WI App 16

(Also reported in 745 N.W.2d 701.)

373

On behalf of the respondent-appellant, the cause was submitted on the brief of *Ann T. Bowe* of Gettelman Mansion of Milwaukee.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Molly J. Jasmer,* assistant corporation counsel of Waukesha.

A nonparty brief was filed by *Daniel P. Fay* of *Oakton Avenue Law Offices, S.C.* of Pewaukee.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. BROWN, C.J.[1] There are several issues in these termination of parental rights cases, all of them important. But what makes these cases unique is that the court, the Waukesha County Department of Health and Human Services ("Department"), the guardian ad litem, and the defense attorney all recognized the importance of the deported father's (Teodoro E.) ability to participate meaningfully in the proceedings, and pursued every option to secure his physical presence in the courtroom. When these options failed, the court, the Department, and Teodoro's attorney devised a webcam system by which Teodoro could see and hear the proceedings in the courtroom and be seen and heard by the local participants. We hold that this approach offered Teodoro meaningful participation in the proceedings, unlike the simple telephone connection used in *State v. Lavelle W.*, 2005 WI App 266, 288 Wis. 2d 504, 708 N.W.2d 698. We further conclude that Teodoro, who was excluded from this country but otherwise maintained his freedom, had the ability to meet at least some of the conditions of return, but nevertheless failed to meet them. Unlike the incarcerated parent in *Kenosha County Department of Human Services v. Jodie W.*, 2006 WI 93, ¶ 47, 293 Wis. 2d 530, 716 N.W.2d 845, Teodoro was not deemed unfit solely for failing to meet impos-

---

[1] Termination of parental rights appeals are ordinarily decided by one judge. WIS. STAT. § 752.31(2)(e) (2005–06). This case was converted to a three-judge appeal because of the important legal issues involved, and also to highlight the circuit court and the parties' use of technology to provide meaningful hearing participation to a parent whose physical appearance was impossible. *See* WIS. STAT. RULE 809.41(3). All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

sible conditions. We also uphold the circuit court's findings that the Department made a good-faith effort to provide services to Teodoro, and that termination was in the best interests of the children. We therefore affirm.

¶ 2. Teodoro is from Mexico and came to the United States illegally around 1998. He met Cherry C. in 2000 and they eventually had two children, Adrianna and Antonio. Teodoro was found to be the father of both children in paternity actions and was ordered to pay child support. By September 2006, he was several thousand dollars in arrears on his payments.

¶ 3. Before Adrianna, the eldest, was born, the Department began to receive referrals regarding concerns about Cherry's ability to take care of children. These referrals continued to come in until 2002, when the Department filed petitions alleging that both Adrianna and Antonio were children in need of protection and services.

¶ 4. In March 2004, Cherry went to jail after her probation was revoked. Adrianna and Antonio were put in foster care because the Department determined that Teodoro and the father of Cherry's other child, with whom Teodoro was living at the time, could not handle the children's care. In October 2004, the court formally placed the children in foster care and Teodoro and Cherry received the required TPR warnings. Though he was initially not cooperative with the Department, Teodoro eventually began working on his conditions of return, to the point that in July 2005 the circuit court ordered Adrianna returned to his care.

¶ 5. However, in August 2005, Teodoro was jailed on a probation hold for failing to cooperate with his probation officer. In November 2005, he was deported and excluded from the United States for ten years. On

377

December 8, 2005, the circuit court changed the children's placement to foster care and again gave Cherry and Teodoro TPR warnings. On September 8, 2006, the Department filed a petition to terminate both parents' rights to both children. As later amended, the petitions alleged as grounds: (1) abandonment under WIS. STAT. § 48.415(1)(a)2.; (2) continuing need of protection and services under § 48.415(2); and (3) failure to assume parental responsibility under § 48.415(6).[2] At Teodoro's request, Attorney Michael D. Kaiser was appointed to represent him in the termination proceedings.

¶ 6. In January 2007, Teodoro moved for a dismissal or adjournment of the proceeding on the grounds that because he could not appear other than by telephone, his right to meaningfully participate and assist counsel could not be protected. Teodoro noted that English was not his first language and that the proceedings would involve voluminous records, further complicating his remote participation. He informed the court that he had investigated the possibility of returning to the country for trial but that the U.S. government would not allow it. He argued that in these circumstances, the Department was required to ensure that his rights were protected. As an alternative to a dismissal or adjournment, Teodoro asked that copies of trial exhibits be forwarded to him in Mexico in advance of trial.

¶ 7. In Kaiser's attached affidavit, he described his efforts to secure Teodoro's presence. Kaiser had gone to the Department of Homeland Security, where an officer informed him that because Teodoro had never

___

[2] Cherry eventually agreed to voluntary termination of her parental rights to Adrianna and Antonio.

applied for any kind of legal entry to this country, he had "no status" and Homeland Security could not assist him. The officer had further made it known that it would be "extremely unlikely" under the circumstances that Teodoro would be allowed back into the country. Kaiser had therefore begun to inquire into a "humanitarian parole" to allow Teodoro to attend the proceedings, but again hit a dead end. Kaiser had contacted the Mexican consulate in Chicago and the U.S. embassy in Mexico. Everyone he talked to had said the same thing: he could pursue various legal options, each of which would take a long time and would almost certainly result in failure.

¶ 8. The court held hearings on the matter, and the parties argued the legal issues and discussed different options for proceeding. Margaret Johnson of the Department sought assistance from consulates in Mexico and the United States, and the court and the guardian ad litem, Attorney Daniel P. Fay, contacted U.S. Senator Herb Kohl's office in an attempt to arrange for video conferencing between Waukesha and Mexico. All of these efforts failed: though the Waukesha court had video conferencing facilities available, the facilities located in Mexico were either unavailable or prohibitively expensive.

¶ 9. However, eventually the court and parties arranged to set up two separate webcam connections between the courtroom and a location in Mexico where Teodoro was assisted by a local paralegal, Mario Flores. On one connection, Teodoro could see the witness and hear both the witness and the larger courtroom. On this connection, the court and court's clerk could also see and hear Teodoro. On the second connection, Teodoro could see the entire courtroom and hear the interpreter. He could also communicate privately with Kaiser via an

instant messaging program. Additionally, the Department provided Teodoro and Kaiser with summaries of each witness' expected testimony and copies of all exhibits to be used at trial to avoid surprises. The fact-finding hearings occurred over four days and, at the conclusion, the court found grounds for termination. The court rejected Teodoro's motion claiming that the fact-finding had been deficient, holding that the proceeding had allowed Teodoro to participate meaningfully, and that Teodoro had seemed throughout to be following testimony and observing the witnesses and had become emotional at various times. The court also found that Teodoro's English abilities had not hindered his participation. After a dispositional hearing, the court terminated Teodoro's rights to both children.

■■■■

¶ 10.　Teodoro claims that all the efforts of the court and parties did not suffice to provide him meaningful participation in the hearings. A parent's rights to his or her children are substantial and are protected by due process. *D.G. v. F.C.*, 152 Wis. 2d 159, 167, 448 N.W.2d 239 (Ct. App. 1989). Due process requires that a court ensure the parent's ability to "meaningfully participate" in the proceedings. *Id.* at 167–68. Whether a parent has been afforded the opportunity to participate meaningfully is a question of constitutional fact, which means that we defer to the trial court's factual findings unless they are clearly erroneous, but apply constitutional principles to the facts as found de novo. *See Rhonda R.D. v. Franklin R.D.*, 191 Wis. 2d 680, 700, 530 N.W.2d 34 (Ct. App. 1995).

¶ 11.　Teodoro relies chiefly on *Lavelle W.* In that case, the parent was in the "Witness Protection Program" of the United States Bureau of Prisons. *Lavelle W.*, 288 Wis. 2d 504, ¶ 3. All parties had anticipated

that he would nevertheless be present for the hearing, but the assistant district attorney notified the court one week beforehand that the Assistant U.S. Attorney had told her that the parent would not be produced. *Id.* Both the AUSA and the parent's attorney had explored video conferencing, but it was apparently not possible to arrange in a week's time, if at all. *Id.* The parent's counsel argued that telephone conferencing was the least desirable option and should be used only as a last resort. *Id.* The trial court, however, decided to use a telephone hookup, despite its own assessment that because of the acoustics in the courtroom, "[v]ery rarely do people on the phone line hear everything that is going on." *Id.*, ¶ 4. On appeal, we noted that although the trial court contacted the Assistant U.S. Attorney in an attempt to "cut through the bureaucracy," there were at least two formal avenues to getting the parent produced that could have been pursued but were not. *Id.*, ¶¶ 4–7.

¶ 12. We pointed out, however, that the unexplored possibilities for securing the parent's physical presence would be "academic" if the telephone connection had allowed the parent to "*meaningfully* participate" in the proceedings, as the law requires. *Id.*, ¶ 8. However, it did not, because it was not the functional equivalent of personal presence. *Id.* The telephone connection did not allow the parent "to assess the witnesses, confer with his or her lawyer, and, of course, hear *everything* that is going on." *Id.*

¶ 13. Teodoro asserts that this case is "virtually identical to the situation in *Lavelle.*" He argues that although he could see and hear, and be seen and heard, through the webcams, the record shows one of the two connections was repeatedly disrupted during the fact-finding hearings. Therefore, he claims that contrary to the circuit court's finding, he was not able to meaning-

fully interpret the spoken words, body language and nuances taking place inside the courtroom. He argues that, like the parent in *Lavelle W.*, he was denied meaningful participation in the proceedings.

¶ 14. We first point out that Teodoro's claim is, at least in part, a challenge to the trial court's factual finding that he followed and understood the proceedings, and we must reject it unless the court's finding was clearly erroneous. *See Rhonda R.D.*, 191 Wis. 2d at 700. Having examined the record, we conclude that it was not. Though one of the internet connections occasionally (and briefly) went down during the fact-finding hearing, in each case, the court took appropriate action. It instructed Teodoro and Flores to notify it whenever they lost contact (they could do this through the other connection, which did not fail). It repeatedly checked to make sure that Teodoro was able to hear and see everything and had the reporter keep a log of the technical breakdowns and their remedies. Importantly, after brief interruptions in communication, the court noted anything that had occurred which Teodoro might have missed. In fact, regarding the specific communication breaks he now complains of, Teodoro told the trial court on the following day that he understood what the witnesses had said. Though Teodoro now claims that he was unable to interpret the "body language and nuances" in the courtroom, he has not provided any evidence on this point or explained why his view was inadequate.[3]

¶ 15. Further, the system that the trial court used here is plainly and significantly different from the simple telephone setup at issue in *Lavelle W.* One obvious

---

[3] As for Teodoro's alleged lack of English proficiency, the court noted that none of the witnesses ever spoke of Teodoro having significant difficulty understanding English. The record shows Teodoro communicating with the court in English, and at

distinction is that Teodoro was able to *see* both the witness and a wider view of the entire courtroom. Further, Teodoro's attorney was able to communicate with him privately which, as we noted in *Lavelle W.*, is a key component of meaningful participation. *Lavelle W.*, 288 Wis. 2d 504, ¶ 8. In fact, in *Rhonda R.D.*, a case unacknowledged by Teodoro, we held that a *telephone* setup that allowed the parent to consult privately with his lawyer afforded the parent meaningful participation in the termination proceedings. *Rhonda R.D.*, 191 Wis. 2d at 701–03.

¶ 16. In further distinction from *Lavelle W.*, the record in this case shows that all parties, Teodoro's attorney included, explored every option that they were aware of for getting Teodoro into the Waukesha courtroom. We cannot say with certainty that there is absolutely no way that they could have succeeded, but Teodoro does not seem to think so, as he has offered no suggestion of other options that might have been pursued. This may, as we said in *Lavelle W.*, 288 Wis. 2d 504, ¶ 8, be "academic" in a legal sense, in view of our conclusion that the remote webcam was the functional equivalent of physical presence, and thus did not deny Teodoro meaningful participation in the termination proceedings. But it was not inconsequential in a practical sense. If the circuit court had insisted on Teodoro's physical presence, which was apparently impossible, there is no telling how long things would have continued in the posture that they were in: Teodoro in Mexico and the children in foster care and in legal limbo, their future unknown. This would have been grossly unfair to

one point when Teodoro briefly lost the ability to hear the translator, Flores confirmed that he had nevertheless followed the testimony in English.

the children, as well as contrary to the legislative directive that TPR cases proceed in a timely fashion. *See Rhonda R.D.*, 191 Wis. 2d at 698–99.

█

¶ 17. Teodoro also argues that the webcam setup deprived him of the effective assistance of counsel—because he was not physically present in the courtroom next to Kaiser, he could not effectively cooperate in his defense. In fact, Teodoro argues, this situation was so detrimental to effective representation that we should not even apply the usual two-pronged deficiency/prejudice test for ineffective assistance of counsel found in *Strickland v. Washington*, 466 U.S. 668, 691–92 (1984). Rather, Teodoro claims, we must apply the analysis found in *United States v. Cronic*, 466 U.S. 648 (1984), which discards the prejudice requirement where

> counsel has been "prevented from assisting the accused during a critical stage" of the prosecution; where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; or under circumstances where "although counsel is available . . . the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the [proceeding]."

*Van Patten v. Deppisch*, 434 F.3d 1038, 1041 (7th Cir. 2006) (citing *Cronic*, 466 U.S. at 659–60 and 659 n.25), *vacated and remanded by Schmidt v. Van Patten*, 127 S. Ct. 1120 (2007), *judgment reinstated by Van Patten v. Endicott*, 489 F.3d 827 (7th Cir. 2007), *reversed, Wright v. Van Patten*, 128 S. Ct. 743 (2008).[4]

─────────

[4] After the original release of our opinion in this case, the United States Supreme Court reversed the Seventh Circuit's

¶ 18. Teodoro relies on *Deppisch* for this argument. In that case, the trial court had taken the defendant's plea at a hearing where the defense attorney appeared by speakerphone. *Deppisch*, 434 F.3d at 1040. The Seventh Circuit held that this was insufficient under the *Cronic* test, *Deppisch*, 434 F.3d at 1045, noting that the defendant could not confer privately with the attorney. *Id.* at 1043. Even if such private discussion had been made available, the court said, "long-distance lawyering" would not suffice at such a critical stage in a criminal proceeding because the court would not be able to supervise the defense attorney to ensure that he or she was paying attention. *Id.* at 1045.

█

¶ 19. Just as with *Lavelle W.*, the procedures adopted by the circuit court in this case distinguish it from *Deppisch*. The record shows that Teodoro could consult privately with his attorney. Moreover, his attorney was physically present in the courtroom. Thus, unlike in *Deppisch*, there was nothing preventing the court from keeping an eye on either Teodoro or his counsel.[5] We reject Teodoro's ineffective assistance argument.

---

*Van Patten* decision. *Wright v. Van Patten*, 128 S. Ct. 743 (2008). Though we continue to view that case and our own as fundamentally different factually, we note that the Supreme Court's decision means that the speakerphone procedure used in that case does not contradict clearly established federal law, as determined by Supreme Court precedent. *Id.* at 745.

[5] At one point in his brief, Teodoro points out that Mario Flores was "an employee of the Mexican government" and not, according to Teodoro, an attorney. In our view, this is irrelevant. The only counsel we are concerned about is the one who represented Teodoro in the proceedings, Michael Kaiser, who is an attorney.

¶ 20. We therefore turn to Teodoro's substantive claims: that the court's finding of his unfitness was factually incorrect and was also premised on his failure to meet impossible conditions of return. To find a parent unfit due to continuing need of protection or services, a court must first find by clear and convincing evidence that: (1) the child has been adjudged in need of protection or services and placed outside the home by a court order containing the required warnings; (2) the agency responsible for care and custody of the child has made a reasonable effort to provide services ordered by the court; and (3) the child has been outside the home for a cumulative total of six months or more, the parent has failed to meet the conditions of safe return, and there is a substantial likelihood that the parent will not do so within nine months of the hearing date. WIS. STAT. § 48.415(2)(a)1.-3. (elements); *Odd S. - G. v. Carolyn S. - G.*, 194 Wis. 2d 365, 375, 533 N.W.2d 794 (1995) (clear and convincing evidence).

¶ 21. Teodoro first claims that the conditions that he did not meet were impossible for him to meet, violating his due process rights. He relies on *Jodie W.*, a case involving the termination of the rights of a mother in prison. *Jodie W.*, 293 Wis. 2d 530, ¶ 4. The circuit court found parental unfitness in that case based solely on the mother's failure to provide a "suitable residence" for her child. *Id.*, ¶¶ 10–11. The supreme court reversed, holding that "in cases where a parent is incarcerated and the only ground for parental termination is that the child continues to be in need of protection or services solely because of the parent's incarceration, WIS. STAT. § 48.415(2) requires that the court-ordered conditions of return are tailored to the particular needs of the parent and child." *Jodie W.*, 293 Wis. 2d 530, ¶ 51.

386

¶ 22. Teodoro points to particular conditions that are impossible to meet for someone who cannot enter the country: for example, one condition requires that he have regular and successful visits with his children. Teodoro argues that he met all of the conditions that it was possible for him to meet given his deportation and that terminating him based on his failure to meet the rest is contrary to the *Jodie W.* holding.

¶ 23. But as the circuit court noted, "Mexico is not prison" and Teodoro remained free to work on and meet many of the conditions of return. As an example, the first condition, "Show that you are interested in your child," includes subparts that deportation should not have prevented Teodoro from meeting, such as "[t]alk to doctors, teachers, therapists and other people who care for your child to learn what your child needs . . . [and] [p]ay child support on a regular basis." The trial court found that Teodoro did neither of these things, either in Mexico or earlier when he was in Waukesha; indeed, during the time that his wages were being garnished to pay child support, he sometimes asked for and received the money back from the children's mother. We affirm the circuit court's holding that the grounds for Teodoro's termination were not based solely on impossible conditions and that *Jodie W.* therefore does not govern this case.

¶ 24. Teodoro's second complaint is that the Department failed to make a good-faith effort to provide the ordered services after he was arrested and deported to Mexico. The circuit court found that the Department made reasonable efforts to provide him with services including therapy, case management, parental education, day care services, and referrals to services that

would assist him in obtaining legal residency in the country. Teodoro's argument to the contrary apparently springs from three alleged facts: that the Department did not arrange for telephone or personal contact between Teodoro and his children when he was in jail and after he was deported; that the Department did not itself keep in telephone contact with him after he was deported; and that the Department was slow to assist him in obtaining birth certificates for the children when he was in Mexico. However, the guardian ad litem and the Department respond to each of these factual claims by pointing to the efforts the Department made, despite obstacles and a lack of cooperation from Teodoro. Additionally, the Department points to portions of the record reflecting the numerous services it provided to Teodoro: for example, it referred him to and paid for a psychological evaluation; it referred him repeatedly to parenting classes; and it paid for day care for Adrianna when she was placed in his home. We do not know how Teodoro would respond to the Department's arguments and examples because he has not filed a reply brief. In any case, the claims Teodoro puts forth about the Department's alleged lack of good-faith effort fall far short of convincing us that we should overturn the circuit court's factual finding. Having upheld the finding of parental unfitness based on continuing need of protection or services, we need not address the alternative grounds of failure to assume parental responsibility.

¶ 25. Teodoro finally argues that at the dispositional stage, the trial court erroneously determined that termination of his parental rights would be in the best interests of the children. This determination is committed to the circuit court's discretion, and will not

be overturned unless that discretion is erroneously exercised. *See Sheboygan County DHHS v. Julie A.B.*, 2002 WI 95, ¶¶ 42–43, 255 Wis. 2d 170, 648 N.W.2d 402. Teodoro acknowledges some of the evidence that the court relied on in coming to its decision, including Adrianna's psychologist's opinion that there was not a substantial relationship between Teodoro and Adrianna and various indications that the children are doing much better since their separation from Teodoro. Teodoro's only argument is to say that the court inappropriately "blamed" him for everything and to make the conclusory statement that "Adrianna and Antonio should be allowed to live with their father in Mexico." He has presented nothing that would cause us to question the circuit court's discretionary determination that termination is in the children's best interest. We affirm.

*By the Court.*—Orders affirmed.