COURT OF APPEALS
DECISION
DATED AND FILED

October 30, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1622**

STATE OF WISCONSIN

Cir. Ct. No. 2022TP41

IN COURT OF APPEALS
DISTRICT II

IN RE THE TERMINATION OF PARENTAL RIGHTS TO N.V.M., A PERSON UNDER THE AGE OF 18:

WAUKESHA COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES,

    PETITIONER-RESPONDENT,

  V.

M.M.M.,

    RESPONDENT-APPELLANT.

        APPEAL from an order of the circuit court for Waukesha County: CODY J. HORLACHER, Judge. *Affirmed*.

¶1 NEUBAUER, J.[1] M.M.M., referred to herein by the pseudonym Mary, appeals from an order terminating her parental rights to her son N.V.M., referred to herein by the pseudonym Neal. At the end of a three-day trial, a jury found two grounds to terminate Mary's parental rights—(1) failure to assume parental responsibility and (2) Neal's continuing need of protection or services. Mary contends that the evidence presented at the trial was insufficient to establish either ground. She also contends that the trial court erred when it concluded that termination of her parental rights was in Neal's best interest. For the reasons explained below, this court concludes that the trial evidence was sufficient to support the jury's verdict and that the court did not err in determining that Mary's parental rights should be terminated. The order terminating her parental rights is therefore affirmed.

## BACKGROUND

¶2 Termination of parental rights proceedings involve two phases: the grounds phase and the dispositional phase. *See Sheboygan Cnty. Dep't of Health & Hum. Servs. v. Julie A.B.*, 2002 WI 95, ¶¶24-28, 255 Wis. 2d 170, 648 N.W.2d 402. In the grounds phase, the finder of fact must determine whether the government establishes the grounds it pleaded "for involuntary termination under WIS. STAT. § 48.415." *Tammy W-G. v. Jacob T.*, 2011 WI 30, ¶18, 333 Wis. 2d 273, 797 N.W.2d 854. If the factfinder determines that the government has established grounds to terminate under § 48.415, "the court shall find the parent unfit." WIS. STAT. § 48.424(4). The proceeding then enters the second,

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

dispositional phase, during which "the court is called upon to decide whether it is in the best interest of the child that the parent's rights be permanently extinguished." *See Steven V. v. Kelley H.*, 2004 WI 47, ¶27, 271 Wis. 2d 1, 678 N.W.2d 856; *see also* WIS. STAT. § 48.426(2).

¶3     In March 2020, the Waukesha County Department of Health and Human Services (County) filed a petition alleging that Neal was in need of protection or services. In June of that year, the trial court found Neal to be in need of protection or services and entered a dispositional order placing Neal in out-of-home care. The order imposed nine conditions Mary would have to meet in order for Neal to be returned to her home, including providing certain information to her assigned case worker, managing her physical and mental health, managing her recovery from substance abuse, providing Neal a "safe, stable and appropriate living environment," and having "regular healthy family interactions" with him.

¶4     In November 2022, the County filed a petition to terminate Mary's parental rights. The County alleged two grounds for termination: first, that Neal continued to be in need of protection or services, and second, that Mary had failed to assume parental responsibility for Neal. *See* WIS. STAT. § 48.415(2), (6). Mary contested the petition and reserved her right to a jury trial.

## I.     The Grounds Trial

¶5     The trial court held a three-day jury trial on the County's petition in November 2023. Mary was the first witness to testify. She confirmed that she had used both cocaine and opioids while she was pregnant with Neal, which led to him being removed from her care shortly after he was born in February 2020. She also acknowledged that she continued to use cocaine after Neal's birth and that she had been incarcerated for violating the terms of her probation for three months in

2022. Before and after her time in custody, Mary did not have stable housing, living at various times in hotels or homes with her grandfather and also with her mother, who had a history of substance abuse. Mary acknowledged multiple drug relapses since Neal's birth, including testing positive for fentanyl on one occasion.

¶6 Mary confirmed that she was familiar with the conditions of return that were imposed in 2020. She underwent a psychological evaluation in 2020 that recommended she participate in therapy, which she believed would have been beneficial and helped her become a better mother. She participated in therapy and drug treatment but did not attend her therapy sessions consistently and did not complete her program. She failed to complete a second, court-ordered psychological evaluation even though she thought it would have been beneficial. Mary also confirmed that she had declined her case worker's request that she undergo random drug testing because she was already undergoing scheduled drug testing at a local clinic and by her probation agent.

¶7 When asked about her communication with her assigned social worker, Mary acknowledged that there were times when she was unreachable. She attributed some of these occasions to issues with her phone service but admitted she also did not always want to speak with the social worker because, in her words, "she constantly badgered me." Mary was assigned a parenting aide at Catholic Charities but eventually chose not to work with her because of "different views" regarding parenting. She also admitted that her treatment at the local clinic was terminated after the clinic discovered her continuing a romantic relationship with an individual who had been physically abusive towards her and was subject to a no contact order.

¶8     Mary testified that she began working with an organization called Welfare Warriors in 2022 because her assigned social worker was not providing her information about what she needed to do to fulfill the conditions of return. She claimed that on several occasions she asked the social worker what she needed to do for Neal to be returned and was told to reread her conditions of return. Welfare Warriors helped her secure housing and with attendance at required meetings.

¶9     Mary also testified about visits that were set up with Neal. She testified that the visits were initially set up to occur at her aunt's house and acknowledged that her aunt had expressed concerns that Mary was under the influence during some of the visits. Mary admitted she did not spend as much time with Neal at her aunt's house as she could have. She described some of the visits as difficult because of things her aunt would say to her. The visits were eventually moved to Mary's house but ended when Mary lost her housing; she later began having virtual visits with Neal but did not attend them consistently. Mary confirmed she has not been employed since Neal was born and has never been his day-to-day primary caregiver.

¶10     Abbey Girman, the social worker assigned to Neal's case, testified about the County's efforts to provide court-ordered services for Mary. Girman described those services as including communicating with Mary, reviewing the conditions of return with her, and monitoring her progress with therapists and other service providers. Girman also scheduled regular meetings with Mary to review her progress and identify any obstacles she was experiencing to fulfilling the conditions.

¶11    Girman testified that she arranged for Mary to receive parenting education from several different providers, but described Mary's work with one of them as "inconsistent." In addition, Girman worked to make sure that Mary had regular visits with Neal. In regards to mental health services, Girman communicated with providers to make sure Mary was "adher[ing] to the recommendations and the psychological evaluation." Girman also kept in touch with Mary's probation agent regarding her whereabouts and contact information.

¶12    In addition to the County's efforts, Girman also testified about Mary's efforts to meet the court-ordered conditions of return. She testified that Mary did not meet any of the nine conditions and gave reasons for each of her conclusions. The first condition pertained to managing Mary's mental health. Mary's therapists informed Girman that Mary failed to consistently attend her therapy sessions, which made it difficult to determine if she was making progress. One therapist told Girman that Mary's inconsistent attendance led to her therapy being discontinued. According to Girman, Mary's lack of progress in therapy led to a court order for a second psychological evaluation "to see if there w[ere] any … specific things we should be aware of … regarding treatment as well as any other additional recommendations pertaining to treatment." Girman discussed the evaluation "[n]umerous times" with Mary, including making clear that transportation was available if she needed it, but Mary did not participate.

¶13    Girman also testified that Mary failed to comply with the second condition that required her to keep her social worker updated as to her contact information and to provide information needed for the social worker to make recommendations to the court. Girman explained that she was frequently unable to contact Mary because her phone number had changed and she had difficulty ascertaining where Mary was living when she was moving between hotels.

6

¶14     With respect to the third condition requiring Mary to manage her substance abuse recovery, Girman testified that Mary

> did not demonstrate an understanding of how her substance use, which is why we were involved in the first place regarding [Neal], how it impacted her ability to parent safely, and how the use of others around her, such as her mother, impacted her own use. She was unsuccessful in being able to identify triggers, patterns regarding her use. And on top of that, she had numerous drug screens that were positive for various substances.

Girman recounted her efforts to get Mary into randomized drug testing and the reasons Mary gave for refusing to do so, including her suspicion that the tests could be tampered with and her belief that testing was unnecessary because she was sober. Girman also described occasions on which she communicated with Mary and suspected from her speech and fidgeting that she was under the influence. In addition, Girman testified about an incident in March 2022 when, according to a police report, Mary, her mother, and her grandfather were discovered in a hotel room "with a variety of drugs including fentanyl, cocaine, Zanax and … Oxycodone."

¶15     As to the fourth condition requiring Mary to provide a safe and stable living environment for Neal, Girman testified that Mary was unable to secure stable housing and lived at various times with persons who were of concern to the County given their history of violent conduct or substance abuse. Although Mary secured housing through Welfare Warriors in January 2022, Girman was unsure how much time Mary actually spent in that housing because Girman observed "no change regarding where the chairs were, where things had been left in the home, and just zero change within the residence" between her visits. Mary lost that housing when she was incarcerated for several months in 2022 and was

not able to secure other housing that the County deemed safe and appropriate for Neal to visit.

¶16 Girman testified further that Mary failed to meet the fifth condition, which required her to show that she was able to meet Neal's needs. Though she provided appropriate supervision and guidance during her visits with him, she was not consistent in attending his medical and therapy appointments and continued to associate with persons who had a history of violence or substance abuse.

¶17 The sixth condition required Mary to show an understanding of "the need for a plan in time of crisis and the importance of a support system for [her] family." Girman explained that this condition required Mary, among other things, to show an understanding of "formal supports"—persons who offered support as part of their job—and "informal supports," such as neighbors and family members who would remain in Mary's life after the County's involvement ended. In Girman's opinion, Mary did not utilize "formal supports" like Girman and Mary's therapists because of her inconsistent communication and engagement with them. Girman also explained that Mary did not expand her circle of "informal supports" beyond her mother and grandfather and did not demonstrate an understanding of "who is a positive support that supports her meeting her goals, remaining sober, having stability in her life, and … is a helpful person for her …."

¶18 Girman also testified that Mary did not meet the seventh condition, which required her to manage her own physical health and to ensure that it did not prevent her from being a responsible parent to Neal. Girman explained that Mary "postponed, rescheduled, or cancelled" multiple visits with Neal "due to her own health issues, [which] impacted her ability to parent safely." For similar reasons, Girman did not believe that Mary had met the eighth condition of developing her

relationship with Neal through "regular healthy family interactions." Though she conceded that Mary "has always expressed love and sensitivity toward [Neal]," Girman testified that there were multiple occasions when she would go weeks without seeing him when he was placed with her aunt. Girman also testified that Mary engaged in behaviors that indicated possible substance use during visits, such as falling asleep and frequently using the restroom. Mary also "tested positive for morphine, cocaine, and THC" on one day that she had a scheduled visit with Neal. Girman confirmed that Mary never progressed to having unsupervised visits with Neal "[d]ue to the ongoing substance use and inconsistency with visits…. He needed more stability and consistency with his mother, and she was not demonstrating that successfully."

¶19 The ninth and last condition required Mary to cooperate with the Wisconsin Department of Corrections and the criminal court, which included not violating the terms of her probation. Girman testified that Mary did not meet this condition because she was incarcerated for several months in 2022 for having violated the terms of her probation, tested positive for drugs on multiple occasions while on probation, and did not participate in programming.

¶20 Girman acknowledged that Mary expressed a lack of understanding as to what was required of her "[a]t times," and testified that she "arranged additional meetings to review the conditions of return and create … smart goals" that would help her understand what the County "needed to have … to properly assess what she was doing." Girman said she told Mary to attend Neal's medical appointments and continue her therapy and believed she communicated the County's goals and expectations in a way that Mary could understand.

## II.    The Dispositional Phase

¶21    Following the jury verdict, the trial court held a disposition hearing at the end of November 2023.  Neal's foster mother testified that she had been fostering him for the past two and one-half years (since he was sixteen months old) and was in the process of obtaining approval to adopt him.  She described him as having "become a part of [her] family" with her husband and six biological children.  She also described him as a healthy child and confirmed that he does not have any physical or mental health issues or any other needs that would be a barrier to adoption.  She testified that Mary had been inconsistent in attending her video calls with Neal and had only "attended some" of his appointments.

¶22    Girman confirmed that Neal's foster parents were committed to adopting him and described him as "interact[ing] really well" with their biological children.  She described Neal as having bonded with his foster family.  In contrast, she was "not sure [she] could say" he had a "substantial" relationship with Mary.  She testified that Mary had, "through the life of the case, … been late to many visits" with Neal.  She also acknowledged continuing concerns with Mary's "substance use and her mental health and how they impact her ability to function on the day-to-day and impact her ability to care for herself."

¶23    Girman believed it was "very likely" that Neal's foster parents would adopt him.  If his birth parents' rights were not terminated, Neal would likely remain in foster care indefinitely because the social worker would not recommend reunification with the birth parents.  The social worker opined that Neal would not be harmed if Mary's parental relationship to him were terminated because he had never lived with her and she had never been his primary caregiver.  She agreed that termination of Neal's birth parents' rights was in his best interest

and would allow him to enter into "a more stable and permanent family relationship."

¶24 Mary testified about her loving bond and experiences with Neal. She testified about the activities she and Neal engaged in during their visits. She also testified about her efforts to help Neal overcome a speech difficulty. She described Neal as having a loving relationship with her grandfather. She acknowledged having "a better understanding" of what is required of her and a willingness to continue working with the County if her rights were not terminated. Mary's grandfather also testified about playing with Neal and watching Mickey Mouse during visits with him.

¶25 After hearing the testimony, the trial court determined that terminating Mary's parental rights was in Neal's best interest. Looking to the factors that inform the best interest standard under WIS. STAT. § 48.426(3), the court first noted the testimony from the social worker and Neal's foster mother that showed a likelihood that Neal would be adopted. The court also noted his young age and overall good health. Though Neal was too young to "articulate what he wants as a result of these proceedings and where he wants his placement to be," the court acknowledged the testimony that he enjoyed visits with Mary, his "apparent bond" with the children of his foster parents, and his positive adjustment into that family.

¶26 The trial court also observed that Neal had been physically separated from Mary since a few days after his birth and had been placed with his foster parents for more than two years. Although he had had visits with Mary, the last visit had occurred nearly five months before the disposition hearing and their last interaction of any kind had occurred about three months before the hearing. The

court also noted Mary's struggles with addiction and the need for Neal to have permanency in his living situation so "that he can begin to heal." The court expressed its view that terminating Mary's parental rights would not "have any bearing" on Neal because "[f]or all intents and purposes, [Mary] has not really exercised any legal right throughout the duration of [Neal]'s life." Given these facts, the court believed that Mary did not have a "real motherly bond [or] motherly relationship [or] motherly exercise of duty and obligation to [Neal]."

¶27 Finally, the trial court noted that Neal would be left "in limbo in the foster care system" if Mary's parental rights were not terminated, which would not provide him with "that stable and loving relationship" he would need during the remaining years of his childhood. Based on its conclusion that termination would be in Neal's best interest, the court entered an order terminating Mary's parental rights.

## DISCUSSION

### I.     The Jury's Verdict is Supported by Sufficient Evidence.

¶28 Mary first argues that the evidence presented to the jury was insufficient to establish either ground for termination found by the jury. This court "review[s] as a question of law whether the evidence presented to a jury is sufficient to sustain its verdict." *Sheboygan Cnty. Dep't of Health & Hum. Servs. v. Tanya M.B.*, 2010 WI 55, ¶18, 325 Wis. 2d 524, 785 N.W.2d 369. "A jury's verdict must be sustained if there is any credible evidence, when viewed in a light most favorable to the verdict, to support it." *Id.*, ¶49.

### A. Continuing Need of Protection or Services

¶29 As noted above, the County asserted two grounds to terminate Mary's parental rights. The first ground, continuing need of protection or services, required the County to prove that (1) Neal had been adjudged to be in need of protection or services and placed outside his home under one or more court orders; (2) the County "made a reasonable effort to provide the services ordered by the court"; and (3) Mary failed to meet the conditions established for Neal's safe return. *See* WIS. STAT. § 48.415(2)(a)1.-3.

¶30 Here, the first element was not disputed: Neal had been found to be in need of protection or services and placed outside the home pursuant to a court order. The jury was only asked to determine whether the County had established the second and third elements. In arguing that the evidence was insufficient to establish these elements, Mary focuses solely on her testimony, which in her view shows that she went "beyond what was necessary to have [Neal] returned to her" and suggests that the County did not make reasonable efforts to assist her in meeting the conditions for return.

¶31 This court's review of the evidence cannot be so circumscribed, however. This court must examine all of the testimony and other evidence presented in analyzing whether "any credible evidence" supports the jury's verdict. *See **Tanya M.B.**,* 325 Wis. 2d 524, ¶49. Here, Girman's testimony provides a sufficient basis for the jury's determinations that the County made reasonable efforts to provide court-ordered services and that, despite those efforts, Mary failed to meet the conditions of return. Girman identified the services the County was ordered to provide in the dispositional order and explained to the jury how she went about providing them. She testified that she attempted to maintain

13

regular communication with Mary, helped connect her with mental health and substance abuse treatment providers, facilitated visits with Neal, and scheduled meetings with Mary to review her progress in meeting the conditions of return. Mary offers no reason why the jury could not have found her testimony credible or why it could not have concluded that the testimony established that the County made a reasonable effort to provide court-ordered services.

¶32    This court reaches the same conclusion with respect to the third element. Mary argues that her testimony showed that she made efforts to comply with every condition listed in the dispositional order. However, she again fails to address Girman's testimony about how, despite those efforts, Mary failed to meet any of the conditions. Girman testified about each of the nine conditions and explained why, in the County's view, Mary did not satisfy any of them. The detail offered in these explanations could reasonably be viewed by jurors as bolstering Girman's credibility. Mary fails to explain why the jury could not find Girman's testimony on this issue credible. Accordingly, she has failed to carry her burden of establishing the absence of credible evidence in the record supporting the jury's verdict.

### B.  Failure to Assume Parental Responsibility

¶33    The second ground for termination found by the jury, failure to assume parental responsibility, "is established by proof that the parent has never had a substantial parental relationship with the child." *State v. Bobby G.*, 2007 WI 77, ¶45, 301 Wis. 2d 531, 734 N.W.2d 81; WIS. STAT. § 48.415(6)(a). A "substantial parental relationship" under § 48.415(6) is "the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." Sec. 48.415(6)(b). The statute explains further

14

that in evaluating whether a substantial parental relationship exists, the factfinder may consider "whether the person has expressed concern for or interest in the support, care or well-being of the child [and] whether the person has neglected or refused to provide care or support for the child." *Id.* The court is to examine the totality of the circumstances and "should consider a parent's actions throughout the entirety of the child's life when determining whether he [or she] has assumed parental responsibility." *Tammy W.-G.*, 333 Wis. 2d 273, ¶¶22-23. The court may also consider whether the parent "exposed her child to a hazardous living environment." *Id.*, ¶22.

¶34 Mary again focuses exclusively on her own testimony, arguing that her visits with Neal and expressions of concern for his welfare to others established a substantial relationship with him. Mary's testimony, however, is not sufficient to show the absence of any credible evidence in the record to show that she failed to assume parental responsibility for Neal. Viewed in the light most favorable to the jury's verdict, Girman's testimony was sufficient to sustain it. Girman testified about Mary's repeated and long-standing issues with illegal drug use, her inconsistency in addressing her drug and mental health treatment needs, her inability to be consistent in attending visitations with Neal, and the fact that she had never assumed day-to-day responsibility for his care and well-being. Given Mary's limited and incomplete progress towards meeting the conditions of return, Girman told the jury that the County never gave serious consideration to placing Neal in her care. Though Mary expressed love and concern for her son and made some efforts to be a parental presence in his life, the trial record contained credible evidence from which the jury could conclude that she did not have a substantial relationship with him because she never "exercise[d] … significant responsibility for [his] daily supervision, education, protection and

care." *See* WIS. STAT. § 48.415(6)(b). Mary's challenge to the jury's verdict on this ground thus fails.

## II. The Circuit Court Did Not Erroneously Exercise Its Discretion in Terminating Mary's Parental Rights.

¶35 Mary's other argument is that the trial court erred in terminating her parental rights. The determination whether to terminate a parent's rights "depends on firsthand observation and experience with the persons involved and, therefore, is left to the discretion of the trial court." *Gerald O. v. Cindy R.*, 203 Wis. 2d 148, 152, 551 N.W.2d 855; *see also* *State v. B.W.*, 2024 WI 28, ¶70, 412 Wis. 2d 364, 8 N.W.3d 22. Accordingly, this court reviews a trial court's decision under the deferential erroneous exercise of discretion standard. *See* *Waukesha Cnty. Dep't of Health & Hum. Servs. v. Teodoro E.*, 2008 WI App 16, ¶25, 307 Wis. 2d 372, 745 N.W.2d 701. Under that standard, a trial court's termination decision will be upheld if it considered the relevant facts, applied the proper legal standards, and "using a demonstrated rational process reache[d] a conclusion that a reasonable judge could reach." *See* *Dane Cnty. Dep't of Hum. Servs. v. Mable K.*, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198.

¶36 A trial court's exercise of discretion in determining whether to terminate parental rights is guided by the best interest of the child. *See* WIS. STAT. § 48.426(2). In exercising that discretion, the court must consider the following six factors:

(1) "[t]he likelihood of the child's adoption after termination";

(2) "[t]he age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home";

(3) "[w]hether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships";

(4) "[t]he wishes of the child";

(5) "[t]he duration of the separation of the parent from the child"; and

(6) "[w]hether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements."

*See* § 48.426(3)(a)-(f).

¶37 Here, Mary does not argue that the trial court failed to consider the relevant facts or apply the correct law. Instead, she contends that the court's "weighing [of the factors in WIS. STAT. § 48.426(3)] was erroneous" because, in her view, the court gave "great emphasis" to Mary's history of addiction but did not give sufficient weight to "the fact that [Mary] continues to express her love and desire to have her child returned to her."

¶38 Mary's argument falls short of showing an erroneous exercise of discretion. As this court recently observed, a parent's "arguments about her progress toward possible reunification and her love for her children and desire for reunification are not controlling considerations. The circuit court's concern at the dispositional hearing is the *children's* best interest based on the evidence presented, not [the parent]'s." *State v. S.A.*, Nos. 2023AP1288, 2023AP1289, 2023AP1290, 2023AP1291, and 2023AP1292, unpublished slip. op. ¶26 (WI App Oct. 10, 2023), *review denied*, 2024 WI 5, 6 N.W.3d 697.

¶39 This court concludes, based on its review of the record and the trial court's oral ruling, that the trial court did not erroneously exercise its discretion in

determining that terminating Mary's parental rights was in Neal's best interest. The court considered the best interest of the child standard and each of the statutory factors in its ruling. It explained how the testimony supported its findings as to each factor and its overall determination of Neal's best interest. Specifically, the court cited the likelihood that Neal would be adopted, his young age and good overall health, the fact that he had been separated from Mary for nearly his entire life, the lack of a substantial relationship with Mary and the resulting lack of harm to him if that relationship were terminated, and the likelihood that Neal would enter into a more stable and permanent family relationship if he were to be adopted by his foster parents. Mary has not shown that the court applied the wrong legal standards, failed to consider any relevant facts, or reached a decision that no reasonable judge could have reached. Accordingly, she has not established a basis to set aside the court's decision.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.